**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

_____

CASE NO. 23-13239

_____

CASSANDRA M. PRUITT,

*Plaintiff/Appellant,*

v.

UNIVERSAL PROTECTION SERVICES,
LLC d/b/a ALLIED UNIVERSAL SECURITY
SERVICES and KRISTEN ARGUS,

*Defendants/Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
HONORABLE J.P. BOULEE
(1:20-cv-1884)

_____

**APPELLANT'S INITIAL BRIEF**

_____

Lisa C. Lambert
Law Office of Lisa C. Lambert
245 N. Highland Avenue
Suite 230-139
Atlanta, Georgia 30307
404-556-8759
lisa@civil-rights.attorney

**C-1**

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

Appellant/Plaintiff Cassandra Pruitt, pursuant to FRAP 26.1 and 11th Cir. R. 26.1-1, 26.1-2 and 26.1-3, hereby files her Certificate of Interested Persons and Corporate Disclosure Statement:

1.   Kristen Argus (Defendant)

2.   Honorable Christopher C. Bly (District Court Magistrate Judge)

3.   Honorable J.P. Boulee (District Court Judge)

4.   David C. Hamilton (Attorney for Defendants)

5.   Lisa C. Lambert (Attorney for Plaintiff)

6.   Law Office of Lisa C. Lambert (Attorney for Plaintiff)

7.   Martenson, Hasbrouck & Simon LLP (Attorney for Defendants)

8.   Cassandra Pruitt (Plaintiff)

9.   Bianca A. Svensson (Attorney for Defendants)

10.  Universal Protection Services, LLC, d/b/a Allied Universal Security Services (Defendant)

There are no publicly traded corporations involved in this case.

**C-2**

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff/Appellant requests oral argument and submits that oral argument will assist the Court's disposition of this case in focusing on the issues and testing the basis and validity of the contentions of the Parties.

## **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PARTIES AND
CORPORATE DISCLOSURE STATEMENT…………………………………….C-1

STATEMENT REGARDING ORAL ARGUMENT…………………………...C-2

TABLE OF CONTENTS………………………………………………………...i

TABLE OF CITATIONS……………………………………………...……..….iii

STATEMENT OF JURISDICTION……………………………………….…...vi

STATEMENT OF THE ISSUES………………………………………………..1

STATEMENT OF THE CASE..…………………………………………………...2

STANDARD OF REVIEW…………..………………………………………19

SUMMARY OF ARGUMENT…………………………………..…………….....21

ARGUMENT………………………………………………..………………….22

I.    ALLIED AND ARGUS PAID MS. PRUITT LESS MONEY THAN
      MALES WHO HAD THE SAME OR COMPARABLE POSITION ……..22
      A.  Both Defendants are liable under the Equal Pay Act ……………….…22
            1.  Defendants paid Pruitt less than all of her predecessors ………...24
            2.  Defendants paid Pruitt less than who they call her
                "true male comparators" …………...……………….………..28
            3.  Argus qualifies as an employer under the broad
                definition in the EPA ……………..……………………...…...33
            4.  Defendants failed to argue, or plead, any statutory
                affirmative defenses ………………………………………...…..36
      B.  Defendant Allied is liable under Title VII …………………………37

II.   ALLIED RETALIATED AGAINST MS. PRUITT FOR REPORTING
      DISCRIMINATORY WAGES IN VIOLATION OF TITLE VII.................40

CONCLUSION…………………………………………………………………...46

CERTIFICATE OF COMPLIANCE…………………………………………...47

CERTIFICATE OF SERVICE……………………………………………………47

## <u>TABLE OF CITATIONS</u>

**<u>U.S. Supreme Court cases:</u>**

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986)…………..…………..…..…19, 20

*Burlington N & S.F.R. Co. v. White*, 548 U.S. 53 (2006)…………………….…..…40

*Corning Glass Works v. Brennan*, 417 U.S. 188 (1974)..……………..….…….…22

*County of Washington v. Gunter*, 452 U.S. 161 (1981)……………………..…….39

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ………………..…39, 45

*NLRB v. Pittsburgh S.S. Co.*, 337 U.S. 656 (1949)………..……………….…..……35

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ……….…..19, 20

*Sartor v. Ark. Nat. Gas Corp.*, 321 U.S. 620 (1944)…………........................19, 20

*Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)……………….....37, 39

*Thompson v. North American Stainless, LP*, 562 U.S. 170 (2011)…………..…….40

**<u>Federal Circuit Court cases:</u>**

*Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324 (11th Cir. 2004)………....…36

*Arrington v. Cobb County*, 139 F.3d 865 (11th Cir. 1998)……...……24, 25, 27, 28

*Bechtel Constr. Co. v. Sec'y of Labor*, 50 F.3d 926 (11th Cir. 1995)……………41

*Bence v. Detroit Health Corp.*, 712 F.2d 1024 (6th Cir. 1983)………..…30, 31, 32

*Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981)……………………..24

*Brunswick Corp. v. Vineberg*, 370 F.2d 605 (5th Cir. 1967)…………..……......19

*Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008)………………………....…41

*Edmondson v. Velvet Lifestyles, LLC*, 43 F.4th 1153 (11th Cir. 2022)……...……19

*EEOC v. Reichold*, 988 F.2d 1564 (11th Cir. 1993)……………………….......…37

*EEOC v. White & Son Enterprises*, 881 F.2d 1006 (11th Cir.1989)…………....…22

*Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261 (11th Cir. 2008)………...41

*Hankins v. AirTran Airways, Inc.*, 237 F. App'x 513 (11th Cir. 2007)…………...45

*Hinson v. Clinch Cty. Bd. of Educ.*, 231 F.3d 821 (11th Cir. 2000)………...…20, 26

*Hodgson v. Behrens Drug Co.*, 475 F.2d 1041 (5th Cir. 1973)…………….…...24

*Howard v. BP Oil Co.*, 32 F.3d 520 (11th Cir.1994) ……………………..…….46

*Jackson v. Seaboard C. L. R. Co.*, 678 F.2d 992 (11th Cir. 1982).......................…36

*Jones v. UPS Ground Freight*, 683 F.3d 1283 (11th Cir. 2012)………....…19, 44

*Kingsland v. City of Miami*, 382 F.3d 1220 (11th Cir. 2004)……………………..19

*Lavin-Mceleney v. Marist Coll.*, 239 F.3d 476 (2d Cir. 2001)…………………...27

*McLaughlin* v. *Seafood, Inc.,* 867 F.2d 875 (5th Cir. 1989)………………....…33

*Miranda v. B & B Cash Grocery Store, Inc.*,
    975 F.2d 1518 (11th Cir. 1992)……………………………….……..27, 37

*Meeks v. Computer Assoc. Int'l*, 15 F.3d 1013 (11th Cir. 1994)……………....…37

*Mitchell v. Jefferson County Bd. of Educ.,* 936 F.2d 539 (11th Cir. 1991)……….23

*Monaghan v. Worldpay US, Inc.*, 955 F.3d 855 (11th Cir. 2020)……………..…42

*Morrison v. Amway Corp.*, 323 F.3d 920 (11th Cir. 2003)………………………34

*Mulhall v. Advance Sec.*, 19 F.3d 586 (11th Cir. 1994)…………………………38

*Silva v. Dos Santos*, 68 F.4th 1247 (11th Cir. 2023)………..............................…35

*Steger v. General Elec. Co.*, 318 F.3d 1066 (11th Cir. 2003)………..……….23, 36

*Valderrama v. Rousseau*, 780 F.3d 1108 (11th Cir. 2015)…………….………….19

*Welch v. Laney*, 57 F.3d 1004 (11th Cir. 1995)……………………………....…33

*Wexler v. White's Fine Furniture*, 317 F.3d 564 (6th Cir. 2003)………………..44

*Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079 (11th Cir. 2004)……………...…40

*Wirtz v. Lone Star Steel Co.*, 405 F.2d 688 (5th Cir. 1968)………………………33

**Federal District Court cases:**

*Giardina v. Lockheed Martin, Corp.*, No. 02-1030,
2003 U.S. Dist. LEXIS 28385 (E.D. La. July 3, 2003)…........................…42

*Morgan v. United States Soccer Fed'n, Inc.*, No. 2:19-cv-01717-RGK-AGR,
2019 U.S. Dist. LEXIS 221602 (C.D. Cal. Nov. 8, 2019)…………….....31

*Strickland v. Synovus Bank*, No. 2:19-cv-1195-AMM,
2021 U.S. Dist. LEXIS 203539 (N.D. Ala. Sep. 7, 2021)…………..….30, 31

**Statutes:**

28 U.S.C. §1291……………………………………………..…….….……….vi

29 U.S.C. § 203…………………………...…………………...….…..…..33

29 U.S.C. § 206…………………………...…………………….....…22, 36

**Rules:**

Fed. R. Civ. P. 8...…………………………...………….…………..…….36

**Other:**

Charles A. Wright *et al.*, Federal Practice and Procedure (2d ed. 1995)…..…19, 20

EEOC Compliance Manual, § 10-IV.C…………………………………....…30

## STATEMENT OF JURISDICTION

This case is an appeal of a final judgment from the United States District Court for the Northern District of Georgia. Jurisdiction lies under 28 U.S.C. § 1291.

## <u>STATEMENT OF THE ISSUES</u>

I.     Whether a jury should decide Plaintiff's claims that both Defendants paid her disparate wages compared to her male predecessors and counterparts in violation of the Equal Pay Act.

II.     Whether a jury should decide Plaintiff's claims that Defendant Allied paid her disparate wages compared to her male predecessors and counterparts in violation of Title VII.

III.     Whether a jury should decide Plaintiff's claim that Defendant Allied retaliated against her for filing a Charge of Discrimination with the EEOC alleging discriminatory unequal pay in violation of Title VII.

## STATEMENT OF THE CASE

Plaintiff/Appellant Cassandra Pruitt (female) became a certified law enforcement officer in 2002. Doc. 135-1, ¶¶ 1-5. After over a decade in public service, she sought private sector work and applied to Defendant/Appellee Allied Universal Security Services for an open Security Manager position at Atlanta Medical Center's main campus. *Id.*, ¶ 7. She was offered, and accepted, the job with a salary of $52,000.00. *Id.*, ¶ 8.

### Allied & Atlanta Medical Center

Allied contracted with Atlanta Medical Center (AMC) to provide security services at AMC's two campuses: the main campus in downtown Atlanta, AMC-Main, and a southern campus in Eastpoint, AMC-South. AMC-Main had approximately 460 beds, was a Level 1 trauma center, had a dedicated psychiatric ward where security officers were routinely required to "sit on" or monitor psychiatric patients, and had seven medical outer buildings (MOBs). Doc. 135-1, ¶¶ 17, 19. AMC-South was much smaller than AMC-Main; it had approximately 170 beds and no MOBs, was not a trauma center, and security officers were not required to monitor psychiatric patients. *Id.*, ¶¶ 18, 20.

Pursuant to the April 1, 2016 contract between Allied and AMC, **AMC-Main required 1,414.5 hours** of uniformed security and 80 hours of management/supervisory personnel per week while **AMC-South only required**

2

**1,016.0 hours** uniformed security and 40 hours of management/supervisory personnel per week:

> 3.  AlliedBarton will provide 1414.50 hours per week of uniformed service for Atlanta Medical Center (AMC) buildings and campus and also provide 80 hours a week in supervisory/management personnel.

> …

> 5.  AlliedBarton will provide 1016 hours per week of uniformed service for Atlanta Medical Center South (AMC-South) buildings and campus and also provide 40 hours a week in supervisory/management personnel.

Doc. 135-1, ¶ 21; Doc. 135-3.

### Ms. Pruitt's First Year Working for Defendant

Ms. Pruitt started working for Allied on February 12, 2015 and reported to Carey Westgate, the Security Director for AMC-Main (as well as its south campus, AMC-South). Doc. 135-1, ¶ 9. Westgate had a full time Security Manager at each site to assist him: Pruitt at AMC-Main and Tyrone Jacobs at AMC-South. *Id.*, ¶ 10.

Pruitt's day-to-day duties were to manage the operations of all three shifts of hourly security officers, including scheduling, training, and processing payroll. Doc. 135-1, ¶ 12. Her additional responsibilities included: conducting investigations, documenting incidents/activities, hiring and firing hourly personnel; arranging for covering shifts if someone called out; leading daily meetings of security personnel; drafting policies and procedures; checking on psychiatric patients five-fifteen times per day; compiling statistics for management meetings; creating slideshows for

3

hospital orientations for new employees (which was in addition to Allied's orientation); and maintaining files in accordance with Joint Commission reviews. *Id.*, ¶¶ 12-13. Further, Westgate would direct Pruitt to conduct new hire orientation and monthly meetings at AMC-South campus, even though Jacobs was the full time Security Manager there. *Id.*, ¶ 14.

During this first year, Westgate often went on vacation to his lake house and claimed his phone did not work there making him unreachable during these times. Doc. 135-1, ¶ 15.

### Westgate Did Not Do Emergency Management Functions

Westgate's official title was Director, Security and Emergency Management; however, during this time, he did not perform emergency management duties and did not attend emergency management meetings. Doc. 135-1, ¶¶ 23-25. Instead, these responsibilities were handled by AMC employee Jamey Moore—at both the Main Campus and South locations. *Id.*, ¶¶ 23, 26, 33. Moore created all of the emergency management policies and procedures when he previously worked for Allied as a Security Director because these were needed for AMC to qualify as a Level 1 Trauma Center—this preceded Westgate's tenure. *Id.*, ¶ 27.

There were only two emergency management incidents while Pruitt worked with Westgate, each involving inclement weather, and Moore served as the incident commander during both emergencies while Pruitt and Westgate took directions from

him. Doc. 135-1, ¶¶ 29-31.

### Carey Westgate's Demotion

In December 2015, Allied learned that Westgate overbilled AMC by approximately $50,000. Doc. 135-1, ¶ 34. On December 17, 2015, Allied demoted—but not fired—Westgate from his Director position to a new position called "emergency management coordinator" and reduced his salary from $80,000 to $50,000. *Id*., ¶ 35; Doc. 135-5. It was only at this point in time that Westgate completed his emergency management certifications. Doc. 135-1, ¶ 36.

### Pruitt's Assignment of Security Director Responsibilities

After Westgate's demotion, Pruitt reported to Tony Nagel, and above him, Brian MacKay. Doc. 135-1, ¶ 62. Nagel and MacKay told Pruitt that she would be responsible for all of the Security Director responsibilities, as well as her responsibilities as Security Manager, without any additional compensation—MacKay told her she would not get "one red cent more." *Id*., ¶¶ 38-39.

Pruitt pushed back and eventually Allied decided to take the $30,000 reduction in Westgate's salary and split that amount evenly between her and Jacobs through a "stipend" for the "additional duties" beginning in January 2016. Doc. 135-1, ¶¶ 40-41; Doc. 135-6.

At the time they received the stipend, Pruitt was earning a salary of $52,000 and Jacobs was earning a salary of $39,000; splitting the $30,000 between the two

resulted in Jacobs receiving a 38.46% raise to $54,000 and Pruitt receiving a 28.85% raise to approximately $67,000:

| | location | Security Manager salary | security hours supervised per week | stipend | % of salary increase | new salary with stipend |
|---|---|---|---|---|---|---|
| Pruitt | AMC | $52,000.00 | 1414.5 | $15,000.00 | 28.85% | $67,000.00 |
| Jacobs | AMC-south | $39,000.00 | 1016 | $15,000.00 | 38.46% | $54,000.00 |

Doc. 135-1, ¶ 42. Before the stipend, as Security Managers, Pruitt and Jacobs were paid almost the same amount per hour of supervision, though Jacobs' was a few cents more per hour:

| | location | Security Manager salary | weekly pay | security hours supervised per week | amount paid per hour of supervision |
|---|---|---|---|---|---|
| Pruitt | AMC | $52,000.00 | $1,000.00 | 1414.5 | $0.71 |
| Jacobs | AMC-south | $39,000.00 | $750.00 | 1016 | $0.74 |

After the stipend, Jacobs' earnings per hour of supervision jumped to more than $0.10 per hour more than Pruitt's earnings:

| | location | salary with stipend | weekly pay | security hours supervised per week | amount paid per hour of supervision |
|---|---|---|---|---|---|
| Pruitt | AMC | $67,000.00 | $1,288.46 | 1414.5 | $0.91 |

6

| Jacobs | AMC-south | $54,000.00 | $1,038.46 | 1016 | $1.02 |
|--------|-----------|------------|-----------|------|-------|

After being appointed Security Director, Ms. Pruitt was provided a new security badge and business cards showing new title: "Security Director." Doc. 135-8. Pruitt was the first female Security Director at AMC. Doc. 135-1, ¶ 55; Doc. 126-1 at 149.

Allied refused to fill Pruitt's full time salaried position of Security Manager and as a result, she did the work of both full time positions—Security Director and Security Manager; her work hours increased by over 50% per week. Doc. 135-1, ¶¶ 43-44, 50, 54.

Pruitt's Security Director responsibilities following Westgate's demotion, included, but were not limited to:

- continuing to perform all of her Security Manager responsibilities;

- adhering to and overseeing our annual budget for the security department;

- attending daily hospital meetings to represent security (where Moore represented emergency management—not Westgate);

- writing policies;

- having direct communications with the client; ensuring the terms of the contract were met;

- hiring and firing of hourly employees;

- coordinating with the staff and local law enforcement regarding detainees and prisoners coming to the hospital for treatment;

- overseeing psychiatric patients;

- coordinating and leading all "Code Pink" (infant abductions) drills and operations;

- ensuring all employees met the hospital's stringent health requirements;

- overseeing the Manley House (for families of patients) as well as its renovation in 2018;

- maintaining accurate records for the Joint Commission certification review;

- overseeing CCTV surveillance, including upgrading the equipment;

- upgrading the guard shack entrance to the hospital;

- upgrading and renovating the dispatch department; and

- coordinating with the Secret Service and the hospital president in case services were needed.

Doc. 135-1, ¶ 45.

She also attended to emergency management duties at the hospital, such as:

- assisting during Code Whites (inclement weather);

- overseeing and securing PPE materials;

- attending Security and Emergency Management meetings with Jamey Moore;

- upgrading the Code Pink (child abduction) notification system; and

- coordinating all required annual drills for each type of emergency code

(Black, Blue, Red, etc.).

Doc. 135-1, ¶ 46; Doc. 135-7. Emergency management and security in the hospital sense were interrelated because emergencies can disrupt not only patient services but affect the security and safety of the facility. Doc. 135-1, ¶ 47. In fact, during her law enforcement training and certification, Ms. Pruitt took many courses regarding emergency management, including National Incident Management System (NIMS) courses which is universally recognized across all fields for emergency management certifications. *Id.*, ¶ 6.

Pruitt also continued to have responsibilities at AMC-South, including, but not limited to orientation of new Allied employees, safety meetings for all employees, and monthly meetings with hospital staff. Doc. 135-1, ¶ 48.

**Changes to Pruitt's Chain of Command**

In September 2016, Defendant Kristen Argus replaced MacKay. Doc. 135-1, ¶ 63. Josh Emmett replaced Nagel around May 2017 and Kenyatta MacDonald replaced Emmett in March 2018. *Id.*, ¶¶ 64-65. Both Emmett and MacDonald reported directly to Argus. *Id.* Argus reported to Allied's Regional Vice President, William Richard. Doc. 126-1 at 12 (42:8-11).[1]

---

[1] Pursuant to 11th Cir. R. 28-5, all transcript citations are to the document and page number as assigned in the court's electronic filing system—not the individual page numbers assigned by the court reporter(s). The pin-point citations to the court reporter pages are included in parentheticals.

**Roll-Over of Stipend and Additional Pay Increases for Jacobs**

In November 2016, Pruitt's and Jacob's stipends were rolled over into their salaries; this resulted in Pruitt's salary being $67,017.60. Doc. 135-1, ¶¶ 51-52. Jacobs salary increased from approximately $54,000.00 with the stipend to $55,016.00 with the rollover. Docs. 135-35. Around this same time, AMC approved an additional $5.11 per billing hour in order for raises; Pruitt did not receive a raise at this time, just the stipend rollover into her salary. Doc. 135-1, ¶ 56. On January 1, 2017, Jacobs received another raise making his new salary $56,004.00. Doc. 135-1, ¶ 52; Doc. 135-26. Pruitt's salary remained $67,017.60 until January 2021. Doc. 135-1, ¶ 57.

After the rollover and Jacobs' additional raise, Pruitt was still paid $0.91 per hour of supervision that she was providing to AMC-Main, while Jacobs was earning $1.06 per hour of supervision he provided to AMC-South:

|  | location | Security Director salary | weekly pay | security hours supervised per week | amount paid per hour of supervision |
|---|---|---|---|---|---|
| Pruitt | AMC | $67,017.60 | $1,288.80 | 1414.5 | $0.91 |
| Jacobs | AMC-south | $56,004.00 | $1,077.00 | 1016 | $1.06 |

Doc. 135-1, ¶ 53.

**Jacobs' Departure**

In June 2017, Jacobs resigned while under investigation for theft of patient

property; Allied required Pruitt to manage both AMC-Main and AMC-South without any assistance or additional compensation until his replacement was hired, which took three months. Doc. 135-1, ¶¶ 66-69.

### Stevens' Hiring

In September 2017, Robert Stevens replaced Jacobs with a starting salary of $65,000.00—only $2,000 less than Pruitt and $13,000 more than Pruitt's starting salary. Doc. 135-1, ¶¶ 71-72.  Argus was intimately involved in the increase in pay for Stevens when he was hired to replace Jacobs, charting out scenarios and profit margins on the major increase in salary for this position from $56,004.00 to $65,000. Doc. 126-1 at 169-70.

As of September 2017, Pruitt was still being paid $0.91 per hour of supervision that she was providing to AMC-Main, while Stevens was brought in earning $1.23 per hour of supervision at AMC-South:

| | location | Security Director salary | weekly pay | security hours supervised per week | amount paid per hour of supervision |
|---|---|---|---|---|---|
| Pruitt | AMC | $67,017.60 | $1,288.80 | 1414.5 | $0.91 |
| Stevens | AMC-south | $65,000.00 | $1,250.00 | 1016 | $1.23 |

Doc. 135-1, ¶ 73.

### Denial of Assistance For Pruitt to Do Her Job

As Security Director, Pruitt repeatedly requested additional assistance to do

11

both of her jobs (Director and Manager) but was repeatedly denied any support by her managers—however, they did approve pay raises for Stevens' subordinates. Doc. 135-1, ¶¶ 58-60. Without this dedicated, salaried assistance, Pruitt routinely had to come in to work while sick or on vacation to do tasks or was bothered repeatedly while on FMLA leave. *Id*., ¶¶ 80, 97-98.

### **Prior Male Security Directors**

All Security Directors who preceded Pruitt are male, earned a higher salary than her, and each had a full time salaried assistant permitting them to take time off. Doc. 135-1, ¶¶ 55, 74-78; Doc. 127-1 at 8 (27:18-21), 16 (59:7-10); Doc. 127-3, at 26 (25:4-21), 106 (105:11-18); Doc. 127-4 at 25 (24:13-18), 40-41 (39:23-40:6).

Pruitt's immediate predecessor, Westgate, was the Security Director from mid-2014 to December 2015 and earned $80,000.00 per year. Doc. 135-1, ¶ 75.

Before Westgate, Jamey Moore was the Security Director from September 2010 to 2014; his starting salary was in the "mid-80s" and by the time he left the position it was $100,000.00. Doc. 127-4 at 23-24 (22:18-23:6), 28 (27:8-18); Doc. 135-1, ¶ 77. Moore only supervised one hospital, AMC-Main, until his last year with Allied when he was assigned to AMC-South. Doc. 127-4 at 32-33 (31:17-32:3). He was asked to "start a security assessment" at AMC-South when the campuses were merged. *Id*.

And, before Moore, Michael Dunning was the Security Director; his salary

12

at the time he left this position in 2010 was $90,000.00. Doc. 127-3 at 40 (39:12-16); Doc. 135-1, ¶ 79. Dunning claims that he received an initial pay increase for taking on emergency management duties, and later for overseeing security at three additional facilities, including AMC-South. Doc. 127-3 at 39-40 (38:14-39:2), 113-114 (112:13-113:17). His first pay increase from $50,000.00 to $57,500.00 on October 6, 2006, makes no mention of increased duties and the supervisor email notes it was a pay increase for both of the salaried managers at AMC. Doc. 135-18. His second pay increase from $57,500.00 to $90,000.00 happened a year later on October 1, 2007. Doc. 135-19. His supervisor's accompanying email shows that pay increases were for two managers and makes no mention of increased duties, just that it was "a big increase form [sic] our client." *Id*.

### Pruitt's Complaints of Unequal Pay

Pruitt complained about not being paid as much as men numerous times to her managers—including Kristin Argus, William Richard, Josh Emmett, and Kenyatta McDonald—as well as human resource manager Venisha Riggin, to no avail. No one did anything to rectify the situation. Doc. 135-1, ¶¶ 82-90.

In July or August 2017, Pruitt reported and complained about the pay disparity between herself and male directors to Josh Emmett. Doc. 135-1, ¶ 83.

On October 19, 2017, Pruitt and Argus had a lengthy discussion regarding the gender pay disparity and Pruitt's prior and ongoing complaints that other men were

paid more than her. Doc. 135-1, ¶¶ 84-85. Argus told Pruitt that the amount of money her predecessors made was "irrelevant" and that she will only make "what [she is] offered and what [she is] willing to work for." Doc. 135-9 at 11:13-20. Pruitt also complained to Argus that Jacobs received two raises following Westgate's departure, but she only received the rollover into her salary. Doc. 135-9 at 14:19-15:11.

On December 21, 2018, Pruitt emailed Argus and McDonald questioning why she was not provided a raise in October 2016 when the client added $5.11 to the billing rates for the account manager positions—but Jacobs did receive a raise at that time; nothing was done. Doc. 135-1, ¶¶ 86-88; Doc. 135-10.

In mid-January 2019, Argus, Riggin and Vice President Richard had a meeting to discuss Pruitt's complaints of pay discrimination. Doc. 127-5 at 73; Doc. 135-11.

On January 17, 2019, Pruitt followed up with Argus and Riggin regarding her continued complaints of disparate pay and noted that Richard seemed to think a formal investigation or complaint was necessary for any change to take place. Doc. 135-1, ¶ 89; Doc. 135-11. Pruitt noted that she hoped to avoid going to the EEOC and had provided the company with numerous opportunities to rectify the situation. Doc. 135-11.

On February 8, 2019, Pruitt once again followed up with Riggin regarding the

14

status of her internal complaints and once again, nothing happened and nothing changed. Doc. 135-1, ¶ 90; Doc. 135-12.

### April 16, 2019 Charge of Discrimination

Since Allied did nothing despite her numerous complaints about not paying her as much as men, Pruitt filed her first Charge of Discrimination with the EEOC on April 16, 2019. Doc. 135-1, ¶ 91; Doc. 135-13.

Riggin received the Charge from the EEOC on April 19, 2019. Doc. 135-17. On April 26, 2019, Argus and Riggin both admitted to Pruitt that they already had her Charge. Doc. 127-10 at 35 (34:8-15); Doc. 135-1, ¶ 92.

### Pruitt's Removal From AMC

On April 24, 2019, Pruitt had foot surgery and took medical leave. Doc. 135-1, ¶ 100.

On April 26, 2019, two days after Pruitt's surgery, Argus called Pruitt into the office for a meeting while she was still in pain and on prescription pain medication. Doc. 135-1, ¶ 101. During this meeting, Argus told Pruitt that Stuart Downs from AMC wanted her removed from the facility because Pruitt allegedly recorded a patient. *Id.*, ¶ 102. In February 2019, Pruitt took a voice recording—not a video recording—of an interview with a very distressed psychiatric patient who the hospital director thought may be the victim of human trafficking. *Id.*, ¶ 103. But she only did so at the direction of Dirk Watkins (who reported to Stuart Downs), who

15

subsequently ordered Pruitt to play the recording for him; she did not share it with anyone else. *Id.*, ¶¶ 104-106. Pruitt noted that the odd timing of her removal right after they received her EEOC Charge. Doc. 127-10 at 35 (34:8-15).

The discussions between Argus and AMC personnel regarding the removal of Pruitt occurred on April 24, 2019. Doc. 126-1 at 153. Argus: does not remember if Downs called her or she called him; does not know when the call took place; then she "thinks" that Dirk Watkins and Kirk called first—or maybe it was an email, or voicemail, or a call and an email; or it was Kenyatta [McDonald] that heard about the issue and "looped" her in. *Id.* at 21 (pp 78-79). Also, Downs notes he made the decision only after talking to Argus and fails to disclose how he learned of the recording, simply stating, "it was brought to my attention today" without naming who told him—let alone why they delivered this information about a 2 month old interview. *Id.* at 153. And the policy that Pruitt allegedly violated prohibited photographs and video of patients, not voice recording. *Id.* at 154-155.

Pruitt acknowledges that in the meeting with Argus and McDonald on April 26, 2019, she said that no one ordered her to record the interview of the woman; however, she does not know why she said that other than the fact that she was on prescription pain medication at the time. Doc. 135-1, ¶ 107. In fact, Pruitt does not even recall recording this meeting. *Id.* But as Pruitt repeatedly testified in her deposition, Watkins ordered her to record the interview. *Id.*; Doc. 125-1 at 55

(206:24-3, 207:25-208:9), 56 (211:23-212:1).

Until her removal from AMC, Pruitt received only positive feedback from AMC, as well as Allied, regarding her performance as Security Director. Doc. 135-1, ¶ 61.

### June 4, 2019 Charge of Discrimination

On June 4, 2019, Pruitt filed a second Charge of Discrimination regarding her retaliatory removal from AMC. Doc. 135-14.

### Pruitt's Removal From Argus's Chain of Command

Pruitt continued to be in Argus's chain of command until November 2020, when she started to work under Anthony Flowers. Doc 135-1, ¶¶ 108-109. It was not until Pruitt started reporting to Flowers—and not Argus—that she was given opportunities to interview for higher paying positions within the company. *Id*., ¶ 110. She interviewed for and received a higher paying Security Director position in December 2020 and received her first raise since Westgate's demotion in January 2021 as a result of her new position. *Id*., ¶¶ 111-112.

Pruitt is currently employed by Allied as the Director of Security for Daniel Properties where she supervises seven properties, has a fulltime salaried manager to assist her, and is able to take time off work without being summoned to do tasks. Doc. 135-1, ¶ 113.

17

**Course of Proceedings Below**

Pruitt filed her initial Complaint on April 30, 2020 and her amended, operative Complaint on September 20, 2020 alleging gender discrimination in violation of Title VII and the Equal Pay Act, retaliation in violation of Title VII, and state law claims. Docs. 1, 21. Defendant Allied filed its Answer to the Amended Complaint on October 9, 2020. Doc. 24. Defendant Argus filed a motion to dismiss which was granted in part and denied in part; all Title VII and intentional interference claims were dismissed but the EPA claims remained. Docs. 23, 27-28, 51-54. Argus filed her Answer to the Amended Complaint on July 6, 2022. Doc. 95. Following the close of discovery, both Defendants moved for summary judgment as to all counts. Doc. 123. Pruitt filed her response in opposition noting that she was not going forward on her state law claims, only her federal claims. Docs. 135, 136. After the Defendants filed their reply brief, the magistrate judge issued a report & recommendation (R&R) recommending summary judgment be granted as to all counts. Doc. 139. Pruitt timely filed her Objections to the R&R. Doc. 142. The Court adopted the R&R on September 29, 2023 and judgment was entered the same day. Docs. 144, 145. Pruitt timely filed her Notice of Appeal to this Court. Doc. 146.

## STANDARD OF REVIEW

The standard of review of an entry of summary judgment is *de novo*. *See Kingsland v. City of Miami*, 382 F.3d 1220, 1225 (11th Cir. 2004). "Summary judgment is a lethal weapon, and courts must be mindful of its aims and targets and beware of overkill in its use." *Edmondson v. Velvet Lifestyles, LLC*, 43 F.4th 1153, 1159 (11th Cir. 2022), quoting, *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 612 (5th Cir. 1967). At summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). This includes inferences that are "not necessarily the most plausible." *Valderrama v. Rousseau*, 780 F.3d 1108, 1120 n.14 (11th Cir. 2015). If there are "disputed issues of fact, the court may not decide them; rather, [it] must deny the motion." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012). Further, courts "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000). And while "the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id*. at 151, citing 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p. 299 (2d ed. 1995); *see also*, *Sartor v. Ark. Nat. Gas Corp.*, 321 U.S. 620, 624 (1944) (noting "summary disposition of issues… should be on evidence which a jury would not be at liberty to disbelieve"). In other words, "the court should give

credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Reeves*, 530 U.S. at 151, quoting Wright & Miller at 300; *see also*, *Hinson v. Clinch Cty. Bd. of Educ.*, 231 F.3d 821, 826-27 (11th Cir. 2000) (same, quoting *Reeves*). Summary judgment should only "be granted where the evidence is such that it 'would require a directed verdict for the moving party.'" *Anderson*, 477 U.S. at 251, quoting *Sartor*, 321 U.S. at 624.

## SUMMARY OF ARGUMENT

Plaintiff/Appellant Cassandra M. Pruitt was thrust into performing two full time jobs after her boss was demoted; however, Defendants/Appellants failed to compensate her at the same rate as her male predecessors despite the fact that she was performing work that required equal skill, effort, and responsibility. In fact, they paid her at a lower rate for supervisory hours than men who contemporaneous performed the same core duties as her under the same contract. Neither Defendant put forth any defense to the discriminatory wage claims, instead simply arguing that she could not show a *prima facie* case. But Pruitt met her burdens, Defendants failed to meet theirs, and summary judgment should have been denied on her disparate pay claims under the Equal Pay Act and Title VII. After Defendants ignored her numerous complaints of unequal pay, Ms. Pruitt filed a Charge of Discrimination with the EEOC. In response to the Charge, Defendant Allied dug up dirt on Pruitt to concoct an excuse to remove her from her post and subsequently denied her advancement opportunities for a year and a half. But the excuse was simply pretext for retaliation and a reasonable jury could agree. Resolution of Ms. Pruitt's claims requires deciding disputed facts and making credibility determinations and as such, requires a jury trial. The District Court's Order should be reversed and this matter remanded for a jury trial.

## **ARGUMENT**

## I.   **ALLIED AND ARGUS PAID MS. PRUITT LESS MONEY THAN MALES WHO HAD THE SAME OR COMPARABLE POSITION**

Both Defendants paid Ms. Pruitt less money than men in the same or comparable positions in violation of the Equal Pay Act; Defendant Allied did the same in violation of Title VII. As shown herein, the District Court erred in granting summary judgment because Pruitt made her *prima facie* cases under both Acts and Defendants failed to assert any valid defenses. At a minimum, jury questions exist regarding the predecessor or contemporary comparators.

### A. **Both Defendants are liable under the Equal Pay Act**

To establish a *prima facie* case under the Equal Pay Act (EPA), Pruitt must show that "an employer pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974), quoting 29 U.S.C. § 206(d)(1)). And Pruitt is only required to "show discrimination in pay [ ] vis-a-vis *one* employee of the opposite sex." *EEOC v. White & Son Enterprises*, 881 F.2d 1006, 1009 (11th Cir.1989) (emphasis added).

The Equal Pay Act prescribes a form of strict liability: once the disparity in pay between substantially similar jobs is demonstrated, the burden shifts to the defendant to *prove* that a "factor other than sex" is responsible for the differential.

22

A defendant "may avoid liability by proving by a preponderance of the evidence that the pay differences are based on" four statutory defenses. *Steger v. General Elec. Co.*, 318 F.3d 1066, 1078 (11th Cir. 2003). "The burden to prove these affirmative defenses is heavy and must demonstrate that the factor of sex provided no basis for the wage differential." *Id*. (quotations omitted). A burden of *production* then shifts back to the plaintiff to show that defendant's alleged reasons for the disparate pay are not true or "offered as a post-event justification for a gender-based differential." *Id*. (quotations omitted).

Under the EPA, "[t]he plaintiff is not required to prove intentional discrimination, just that the employer pays unequal wages for equal work, as defined in the Act." *Mitchell v. Jefferson County Bd. of Educ.,* 936 F.2d 539, 547 (11th Cir. 1991).

Here, the District Court agreed with the Defendants' argument that Ms. Pruitt could not meet her *prima facie* burden. But taking all facts and inferences in Pruitt's favor, she can show a *prima facie* under the EPA through two different sets of comparators: (1) her male predecessors; and (2) two male security directors who worked at AMC-S, who Defendants call her "true comparators." Doc. 123-1 at 11, 14-16. Defendants failed to argue, let alone plead, any affirmative defense as to her EPA claims and as such, cannot meet their "heavy burden" to prove Pruitt's sex played no part in her wage differential. With no defense argued or alleged, the

burden of production does not shift back to Pruitt because there is nothing for her to show is a "post-event justification" for the discriminatory pay.

### 1. *Defendants paid Pruitt less than all of her predecessors.*

To present a *prima facie* case, Pruitt "does not have to prove that two jobs are identical but rather must show that the "skill, effort and responsibility required in the performance of the jobs are substantially equal." *Arrington v. Cobb County*, 139 F.3d 865, 876 (11th Cir. 1998). In other words, the jobs do not have to be exactly the same, but *comparable.* Further, she does not have to limit her comparators to contemporaries, but her predecessors qualify as comparators as well. *Hodgson v. Behrens Drug Co.*, 475 F.2d 1041, 1048-49 (5th Cir. 1973) (holding comparators may be those in succession or simultaneously).[2] Ms. Pruitt became the first female Security Director at AMC; she was preceded by four men who were all paid more than her for doing substantially equal work as her.

When Ms. Pruitt became the Director at AMC-Main, she was required to not only do the job of Security Director, but that of Security Manager as well; in other words, she held multiple titles. And she did her two jobs without any full time salaried assistance—assistance her predecessors had. Pruitt had regular responsibilities at AMC-South as well, like her predecessors. And Pruitt even

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981.

handled emergency management functions. For all of this, she was paid $67.017.60. Her male predecessors were all paid significantly more than her.

Her immediate predecessor, Richard Westgate, earned $80,000.00 per year during his tenure from 2014 through December 2015. Westgate claims that he devoted a large part of his time solely on emergency management duties; however, this is not true. He was not responsible for any emergency management duties—Jamey Moore did those. And while the written job description lists emergency management tasks, job descriptions do not control over actual duties. *See Arrington*, 139 F.3d at 876 (noting job descriptions "may be considered" but they are not "the controlling factor"). Plaintiff concedes that Westgate was Director over AMC-South as well as Main, but he had two full time, salaried professionals to assist him at each hospital. Pruitt did two full time salaried jobs for less pay with no salaried assistance. The duties that Westgate and Pruitt had were comparable.

Jamey Moore served as the Security Director from 2010 to early 2014; his starting salary was in the "mid-80s" and he was earning $100,000.00 per year by the time he left the position. For his first three years, Moore only served as Security Director over AMC-Main; sometime in 2013 he was assigned to AMC-South as well. Plaintiff concedes that Moore did have emergency management duties—he in fact wrote the policies and procedures during his tenure. But security and emergency management duties work hand in hand, they are not wholly separate specialties. And,

25

he too had a full time, salaried Security Manager to help him with his duties—Pruitt did not. The duties and work load that Moore and Pruitt had were comparable.

Finally, Michael Dunning, who preceded Moore, had a starting salary of $50,000.00 and was earning $90,000.00 per year by 2007; he left the Security Director position in 2010. Dunning claims that he received two substantial pay increases during his tenure, first for taking on emergency management duties, and later for overseeing security at three additional facilities, including AMC-South. But there is no objective evidence that he undertook such distinct tasks. After all, Moore is the Security Director who drafted all the emergency management policies and procedures. And when Moore took over for Dunning, he only supervised AMC-Main—no other properties until 2013, his final year in the position. Plus, the emails accompanying Dunning's pay increases make no mention of the increases being tied to increased responsibilities. Instead, each of these emails show it was an annual raise for both Dunning and his Security Manager; one notes that it was just a big increase from the client, AMC. No jury will be *required* to believe Dunning's testimony. *Hinson v. Clinch Cty. Bd. of Educ.*, 231 F.3d 821, 826-27 (11th Cir. 2000). And, just like Westgate and Moore, Dunning had a full time salaried Security Manager to assist him with his duties—Pruitt did not. The duties and workload that Dunning and Pruitt had were comparable.

The District Court adopted the R&R, finding that Pruitt did not take over

Westgate's job because he supervised two campuses and Pruitt cannot compare herself to a supervisor. Doc. 144 at 7. But Pruitt took over her supervisor's job and was not comparing her salary as Security Manager to that of Security Director but her salary as Security Director to Security Director. She did not compare herself directly to her supervisor, but her predecessors; when she became Security Director she had the same level of responsibility of her predecessors. The R&R claims that there really is no dispute about whether Westgate had emergency management duties because they were part of his job description. Doc. 139 at 9, n.4. But job descriptions do not control over actual duties. *See Arrington*, 139 F.3d at 876. And this fact is disputed. The R&R states that it is conceded that all of Pruitt's predecessors managed multiple locations but as to Moore, this was not true until his final year and as to Dunning, this fact is disputed. Doc. 139 at 40.

But taking the facts and inferences in favor of Ms. Pruitt, the work that she did was substantially similar to each of her three predecessors and a reasonable jury could agree. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (reversing summary judgment on Equal Pay Act claim, finding "a genuine issue of material fact as to the similarity of the jobs...and a reasonable jury could find that B & B violated the Equal Pay Act by failing to pay them equal wages"); *Lavin-Mceleney v. Marist Coll.*, 239 F.3d 476, 480-81 (2d Cir. 2001) (stating [w]hether two positions are 'substantially equivalent' for Equal Pay Act purposes is

27

a question for the jury"). The work that she did required comparable "skill, effort and responsibility" as her predecessors. *Arrington*, 139 F.3d at 876. But she was paid at least $13,000.00 less than the lowest salary of her predecessors and $33,000.00 less than the highest salary of her predecessors. The differential salaries violate the Act and the District Court's order should be reversed as to the predecessor comparators and a jury should resolve Pruitt's claims.

### 2. Defendants paid Pruitt less than who they call her "true male comparators."

In the trial court, the Defendants argued that the "appropriate comparator" or "true comparators" for Pruitt would be the Security Directors at AMC-South: Tyrone Jacobs and Robert Stevens. Doc. 123-1 at 11, 14-16. While Pruitt admits that they had a common core of duties, there were some differences. Namely, the greater size of AMC-Main and corresponding security responsibilities exceeded those at AMC-South. AMC-Main was a Level 1 trauma center that encompassed the hospital as well as seven medical office buildings; it also had a dedicated psychiatric ward where security officers were routinely required to monitor psychiatric patients. AMC-South was one building, not a trauma center, and had no psychiatric ward.

The size disparity is reflected in the contract between AMC and Allied. AMC contractually required Allied to provide 1,414.5 hours of uniformed security and 80 hours of management/supervisory personnel per week at AMC-Main while AMC-South only required 1,016.0 hours uniformed security and 40 hours of

management/supervisory personnel per week. And when the contractual number of security hours supervised each week is examined, *Pruitt was actually paid less* for her work than Jacobs or Stevens:

| | location | Security Director salary | weekly pay | security hours supervised per week | amount paid per hour of supervision |
|---|---|---|---|---|---|
| Pruitt | AMC | $67,017.60 | $1,288.80 | 1414.5 | $0.91 |
| Jacobs | AMC-south | $56,004.00 | $1,077.00 | 1016 | $1.06 |

| | location | Security Director salary | weekly pay | security hours supervised per week | amount paid per hour of supervision |
|---|---|---|---|---|---|
| Pruitt | AMC | $67,017.60 | $1,288.80 | 1414.5 | $0.91 |
| Stevens | AMC-south | $65,000.00 | $1,250.00 | 1016 | $1.23 |

But if they were doing the same exact job as alleged by the Defendants, why were Jacobs and Stevens paid a higher rate based on their required hours of supervision than Pruitt? If Pruitt were paid the same rate for hours of supervision as Jacobs, her weekly pay would have been $1,499.43 and her annual salary would total $77,970.14. And if she were paid the same rate for supervision as Stevens, her weekly pay would have been $1,740.28, with an annual salary of $90,494.59. In other words, her salary would have been closer to that of her predecessors. *See* Section I(A)(1), *supra*.

Notably, when Pruitt and Jacobs were both Security Managers, before the increased responsibility of being Directors with the accompanying stipend and rollovers, the amount each were paid per hour of supervision was *almost* the same

29

(though Jacobs' was a few cents more per hour):

|  | location | Security Manager salary | weekly pay | security hours supervised per week | amount paid per hour of supervision |
|---|---|---|---|---|---|
| Pruitt | AMC | $52,000.00 | $1,000.00 | 1414.5 | $0.71 |
| Jacobs | AMC-south | $39,000.00 | $750.00 | 1016 | $0.74 |

The disparity in pay started with the stipend, and then increased with the rollover and Jacobs' additional pay raise—a raise that Pruitt did not receive—and was exacerbated when Stevens was brought in at an even higher rate of pay than Jacobs.

"[T]otal compensation is not the only relevant pay rate in a claim under the Equal Pay Act." *Strickland v. Synovus Bank*, No. 2:19-cv-1195-AMM, 2021 U.S. Dist. LEXIS 203539, at *33 (N.D. Ala. Sep. 7, 2021). Instead, the measure of determining the wages must be examined.

> Section 206(d)(1) commands an equal *rate* of pay for equal work. Comparison of pay rates entails measuring the amount of pay against a common denominator, typically a given time period or quantity or quality of output.

*Bence v. Detroit Health Corp.*, 712 F.2d 1024, 1027 (6th Cir. 1983) (emphasis in original). So, unequal total compensation based on the same rate of pay does not violate the Act; however, unequal total compensation based on *different* rates establishes a "prima facie violation" of the Act. EEOC Compliance Manual, § 10-IV.C., available at: https://www.eeoc.gov/laws/guidance/section-10-compensation-

discrimination.

The same is true even if a woman earns higher total compensation than their male comparator—because the basis for the pay is the critical factor, not total compensation; a contrary analysis would yield an "absurd result." *Morgan v. United States Soccer Fed'n, Inc.*, No. 2:19-cv-01717-RGK-AGR, 2019 U.S. Dist. LEXIS 221602, at *9 (C.D. Cal. Nov. 8, 2019). Courts agree that the focus should be on the "common denominator." *See id.* at 10, n.2 (collecting cases); *Bence,* 712 F.2d at 1028 (holding plaintiff established a prima facie case based on "[e]valuation of employer's compensation on a 'per sale' basis [which] makes it apparent that it paid female managerial personnel at a lower rate than their male counterparts"); *Strickland*, No. 2:19-cv-1195-AMM at *33 (rejecting defendant's total compensation argument).

To identify the relevant common denominator, courts must perform a "practical inquiry which looks to the nature of the services for which an employer in fact compensates an employee." *Bence*, 712 F.2d at 1027. Here, Pruitt, Jacobs, and Stevens were compensated for providing management of security services. The relevant common denominator should be the hours of supervisory services performed each week pursuant to the contract: 1414.5 hours at AMC-Main and 1016 hours at AMC-South. And when this common denominator is examined in relation to the wages paid, Pruitt's "true male comparators" were compensated at a much

31

higher rate than her without any explanation. This rate differential violates the Act.

The District Court adopted the R&R's finding that using the contractually required supervision hours to determine pay was "arbitrary" as argued by the Defendants. Doc. 144 at 9; Doc. 139 at 34; Doc. 137 at 5. But there is nothing arbitrary about the contractual terms that Allied agreed to with AMC. Pruitt did not make up a number—these are directly from the contract that describes the services provided. Indeed, Pruitt and Jacobs earned almost the same amount per hour of supervision when they were both Security Managers—the disparity started and grew after they became Security Directors. The R&R posits that this number is arbitrary because it could also be based on number of beds or employees supervised. Doc. 139 at 35. But this contractually agreed upon number does subsume the size—that is why Pruitt was responsible for more security hours. The District Court's Order states Pruitt "brought no evidence to show that Plaintiff's—or her comparators'— pay was based on the number of overall security hours required by the hospitals in which they worked" Doc. 144 at 9. But this overlooks the fact that Defendants have never explained how they determined the salaries of these three workers. A "practical inquiry" of the contractual services shows the number of security supervision hours is not arbitrary but the actual services rendered. *Bence*, 712 F.2d at 1027. Even Dunning noted that the number of hours billed per contract reflects the size of the job. Doc. 127-3 at 53 (52:10-17).

The differential rates and corresponding salaries violate the Act and the District Court's order should be reversed as to the contemporary comparators and a jury should resolve Pruitt's claims.

### 3. *Argus qualifies as an employer under broad definition in the EPA.*

Argus can be individually, or jointly, liable under the EPA because she qualifies as an employer under the broad definition in the Act. *See* 29 U.S.C. § 203(d) (defining employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee"). The remedial purposes of the Act "require the courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications." *McLaughlin* v. *Seafood, Inc.,* 867 F.2d 875, 877 (5th Cir. 1989) (analyzing FLSA claims). To determine whether a particular actor falls within that broader group, courts must consider the location of employment, the extent of the control the individual had over the employee, and whether the actor had the "power to fire, hire, or modify the employment condition of the employee." *Welch v. Laney*, 57 F.3d 1004, 1011 (11th Cir. 1995), citing *Wirtz v. Lone Star Steel Co.*, 405 F.2d 688, 669-70 (5th Cir. 1968).

Argus qualifies as an employer under the Act. She was the recipient of numerous discriminatory wage complaints from Pruitt—and at no time did Argus tell Pruitt she had no power or control to correct these wrongs. That is because she did have the power to set Pruitt's salary in an equitable manner (but she didn't).

33

After all, she was involved in setting Stevens' high wage when he replaced Jacobs. In fact, she was the General Manager when Allied failed to give Pruitt a raise in October 2016 when AMC added $5.11 to the hourly billing rate. Plus, as the General Manager, she was only one rung below the Regional Vice President. In fact, she discussed Pruitt's complaints with the VP, William Richard; though again, nothing was done to rectify the situation. Also, Argus is the one who removed Pruitt from her position at AMC and kept her wages stagnated and denied her opportunities while Pruitt remained in her chain of command. *See* Section II, *infra*.

The District Court declined to address Argus' status because it found that Pruitt did not meet her *prima facie* case. Doc. 144 at 9. However, as shown herein, Pruitt has met her *prima facie* case as to both her predecessor and contemporary comparators. The R&R found that Argus was not an employer under the Act; however, in doing so, it made credibility determinations and decided disputed facts in Argus' favor. For example, the R&R cites to Argus' self-serving testimony and disputed statements of fact in finding that Argus played no part in setting salaries of managers under her chain of command or evaluated Pruitt's performance. Doc. 139 at 37, citing Doc. 126-1 at 13-14 and Doc. 136-2 at ¶¶ 72, 74-75. This is error. *See Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003) ("In ruling on a Rule 56 motion, the district court may not weigh the evidence or find facts.").

Plus, Argus' testimony is undermined by contemporaneous emails showing

she was involved in setting Stevens' salary. If a jury disbelieves Argus' testimony, it is free to disregard the remainder of her alleged denials of control over Pruitt's employment. *NLRB v. Pittsburgh S.S. Co.*, 337 U.S. 656, 659 (1949) (stating "in the determination of litigated facts, the testimony of one who has been found unreliable as to one issue may properly be accorded little weight as to the next"); *Silva v. Dos Santos*, 68 F.4th 1247, 1261 (11th Cir. 2023) (noting that "when a factfinder does not believe an interested witness's testimony, it may—but is not required to—consider that witness's discredited testimony as corroborating substantive evidence that the opposite of the testimony is true).

The R&R also found that Pruitt's direct complaints of discriminatory pay to Argus "does not prove that Argus had the power to change them." Doc. 139 at 37. This too, fails to take facts and inferences in Pruitt's favor. If Argus had no power, she could have said so. She did not. Instead, Argus told Pruitt that she will only make "what [she is] offered and what [she is] willing to work for." Doc. 135-9 at 11:13-20. And again, Argus was involved in Stevens' salary—why couldn't she do the same for Pruitt? To say that as a General Manager, one rung below the Regional Vice President, Argus had no power to "modify the employment condition" for Pruitt defies belief and a reasonable jury could agree.

Taking the facts and inferences in Pruitt's favor, Argus qualifies as an employer under the Act and the order should be reversed as to her potential

individual liability.

### 4. Defendants failed to argue, or plead, any statutory affirmative defenses.

In the trial court, the Defendants failed to argue any of the four defenses under the Act, 29 U.S.C. § 206(d)(1), in their motion for summary judgment. Instead, it simply argued that Pruitt cannot meet her *prima facie* case. Doc. 123-1 at 7-12. But Pruitt has shown a *prima facie* case and Defendants have waived any argument to reach its "heavy burden" of proving that Pruitt's sex played no part in the wage differential. As such, there is nothing for Pruitt to rebut and show the excuse is "offered as a post-event justification for a gender-based differential." *Steger*, 318 F.3d at 1078. Of course, Defendants cannot now argue "an issue not raised in the district court." *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004).

Further, Defendants failed to even plead any of the statutory defenses in their Answers to the Amended Complaint. Defendants have the burden of not only proving their affirmative defenses but pleading the same. Fed. R. Civ. P. 8(c). Allied pled 21 affirmative defenses; however, none are one of the four statutory defenses. *See* Doc. 24 at 27-32. Argus pled 19 affirmative defenses; and like Allied, none are one of the four statutory defenses. *See* Doc. 95 at 27-31. Having failed to plead the required statutory defenses, the Defendants have waived the same. *Jackson v. Seaboard C. L. R. Co.*, 678 F.2d 992, 1012-13 (11th Cir. 1982) (upholding trial

36

court's finding that defendant waived defense of "bona fide seniority system" because it did not plead the affirmative defense).

The District Court's Order as to Pruitt's Equal Pay Act claims should be reversed and these claims remanded for determination by a jury.

### B. <u>Defendant Allied is liable under Title VII</u>

To establish a *prima facie* case of unequal pay under Title VII, a plaintiff must show that "she is a female and that the job she occupied was *similar* to higher paying jobs occupied by males." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1529 (11th Cir. 1992) (emphasis added). This is a much less exacting standard than the Equal Pay Act's "substantial equality of positions," and only requires similarity of tasks. *See id*. at n.15; *see also, EEOC v. Reichold*, 988 F.2d 1564, 1569-70 (11th Cir. 1993) (jobs that are sufficiently alike meets prima facie case); *Meeks v. Computer Assoc. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994) (same). And establishing a *prima facie* case is not an onerous task. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

For all the same reasons that Pruitt establishes her *prima facie* case under the EPA, she likewise establishes her *prima facie* case of unequal pay in violation of Title VII: she was paid less than all three of her predecessors and a lower hourly rate for security supervision than either of her contemporaries, Jacobs, or Stevens. *See* Section I(A)(1) and (2), *supra*. The workload and responsibilities of Pruitt and her

three predecessors were similar in nature and meets the Title VII standard. As to Jacobs and Stevens, Allied claims that they are the "true comparators;" Pruitt agrees they shared a common core of duties, but each of these men were paid a higher rate for hours of supervision than Pruitt. And, even if this Court determines that one or more comparators do not meet the standard under the EPA, they can still qualify as comparators under Title VII standards, *Mulhall v. Advance Sec.*, 19 F.3d 586, 599 (11th Cir. 1994) (finding comparator proper under Title VII but not the EPA). And only one comparator is needed to show a *prima facie* case.

Other facts support Pruitt's claims of discrimination under Title VII as well. Allied paid Jacobs a higher raise rate than Pruitt and gave Stevens an inflated salary compared to Jacobs and Pruitt without any reason. When Allied decided to "split" the $30,000.00 between Pruitt and Jacobs, this resulted in her receiving a 28.85% increase in her salary, but Jacobs received a whopping 38.46% increase. No reason was given for the disparate pay increase. Also, in the fall of 2016, an additional $5.11 per billing hour was approved for raises; Jacobs received this raise but Pruitt did not. No reason was given for this disparity. As for Stevens, his starting salary was $65,000.00, a nine thousand dollar increase for the same exact job that Jacobs had. Allied has never provided a reason for this steep increase in salary for the same job— which raised the differential in pay for hours supervised between Pruitt and the AMC-South manager to an even higher degree than before.

Claims for unequal pay under Title VII share the same affirmative defenses as the EPA. *See County of Washington v. Gunter*, 452 U.S. 161, 171 (1981) (finding "only differentials attributable to the four affirmative defenses of the Equal Pay Act" are permitted under Title VII"). Just as Allied failed to meet its "high burden" under the EPA, it cannot meet its lower burden of production under Title VII because it failed to argue, let alone plead, any of the statutory defenses—or argue any other defense.

Instead, Allied hung its hat on the erroneous argument that Pruitt could not show a *prima facie* case. But Pruitt has met her light burden of putting forth a *prima facie* case and Allied's failure to allege a legitimate nondiscriminatory reason for the disparate pay means the burden does not shift to Pruitt to show pretext. *Burdine*, 450 U.S. at 253 (noting under *McDonnell Douglas* burden-shifting paradigm, the burden to show pretext does not shift to a plaintiff until after the employer "articulate[s] some legitimate, nondiscriminatory reason for the [adverse act]"). There is simply nothing for Pruitt to rebut—Allied has never explained how it determined the disparate salaries or provided an excuse for why Pruitt was paid less than her predecessors (other than claiming the jobs were allegedly different) or her contemporaries (other than claiming Pruitt was paid more). But Plaintiff has already shown that the excuses Defendant uses to attack her *prima facie* case are false. She did the same type of work with the same type of responsibility as her predecessors

for a lower salary than each of them. And she was in fact not paid the same paid the same rate for supervision as either Jacobs or Stevens. Pruitt has produced "sufficient evidence to allow a rational trier of fact to disbelieve the [alleged] legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact to find illegal discrimination." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004).

The District Court ruled that Pruitt did not make a *prima facie* case under Title VII for the same reasons she did not put forth a *prima facie* case under the Equal Pay Act. Doc. 144 at 7, 9. But as shown above, Pruitt met her initial burden under both laws.

The District Court's Order as to Pruitt's Title VII unequal pay claims should be reversed and these claims remanded for determination by a jury.

## II. ALLIED RETALIATED AGAINST MS. PRUITT FOR REPORTING DISCRIMINATORY WAGES IN VIOLATION OF TITLE VII

"Title VII's antiretaliation provision prohibits any employer action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Thompson v. North American Stainless, LP*, 562 U.S. 170, 174 (2011), quoting *Burlington N & S.F.R. Co. v. White*, 548 U.S. 53, 64, 68 (2006) (emphasis added). Ms. Pruitt establishes a *prima facie* case of retaliation by showing: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) a causal relationship between the two events. *See*

40

*Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008).

Here, Pruitt lodged multiple internal complaints, with no change to her discriminatory pay. Then on April 16, 2019, she filed her initial Charge of Discrimination regarding her inequitable salary. Allied received the Charge on April 19, 2019. A week later, on April 26, 2019, Allied removed from her position at AMC and forced Pruitt into a cycle of stagnant wages for over a year and a half while she remained under Argus's chain of command. Pruitt filed her second Charge on June 4, 2019, regarding the retaliatory removal.

Pruitt's internal complaints constitute protected activity. And there is no doubt that filing a Charge of Discrimination with the EEOC constitutes protected activity. No reasonable worker would come forward if they thought they would be removed from their position and be denied advancement opportunities for over 18 months. And as this Court has noted, "Burlington also strongly suggests that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered materially adverse to [her]." *Crawford v. Carroll*, 529 F.3d 961, 973, n.13 (11th Cir. 2008).

Pruitt also meets the causal connection prong for the retaliatory acts. She was removed from her position only 7 days after she filed her Charge of Discrimination. *Bechtel Constr. Co. v. Sec'y of Labor*, 50 F.3d 926, 933-34 (11th Cir. 1995) ("Proximity in time is sufficient to raise an inference of causation"). As for Pruitt's

denied advancement opportunities, this started immediately upon her removal from AMC and continued until December 2020 when Pruitt was finally no longer under Argus' chain of command. The continuing series of these acts constitute a retaliatory hostile work environment. *See Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 860, 861-62 (11th Cir. 2020) (analyzing retaliatory hostile work environment claim and holding *Burlington* standard applies).

Allied claims that AMC allegedly requested Pruitt's removal for taking a voice recording of a patient two months before she filed her Charge, in February 2019. But a jury could find Allied's excuse pretext for retaliation. The timing alone is highly suspect. Only 5 days after Allied, including its HR department and Argus, were notified of the Charge, they had discussions with AMC to remove Pruitt. This smacks of digging up dirt. *See, e.g., Giardina v. Lockheed Martin, Corp.*, No. 02-1030, 2003 U.S. Dist. LEXIS 28385 at *27 (E.D. La. July 3, 2003) (trying to "dig up dirt" on the plaintiff raises an issue of fact that she was terminated on the basis of her sex). After all, why did an event that occurred over 2 months prior the Charge suddenly become an issue? And why did these discussions happen on April 24, 2019—the *same day* that Pruitt went out on medical leave for surgery?

Plus, Argus' testimony regarding this issue is unclear at best and purposefully evasive at worse. She testified that:

- she does not remember if Downs called her or she called him;

42

- does not know when the call took place;

- then she "thinks" that Dirk Watkins and Kirk called first—or maybe it was an email, or voicemail, or a call and an email; or

- it was Kenyatta [McDonald] that heard about the issue and "looped" her in

Doc. 126-1 at 21 (78:1-80:15). If she had discussions with Watkins, then she should have known that he was the one who ordered Pruitt to voice-record the patient. If the issue came through McDonald, why and how did McDonald come across something that happened two months prior?

Also, Downs notes he made the decision only after talking to Argus and fails to disclose how he learned of the recording, simply stating, "it was brought to my attention today" without naming who told him—let alone why they delivered this information to him about a 2 month old voice recording. And the policy that Pruitt allegedly violated appears to only prohibit photographs or video recordings—not voice recordings.

Importantly, Pruitt only voice recorded the interview of the patient based on the directive from Downs' subordinate, Dirk Watkins. Watkins had no problem with Pruitt following his orders in February 2019. Pruitt suffered no contemporaneous discipline for the alleged violation. But two months later, 5 days after Allied received her Charge of Discrimination, Watkins is involved in helping Allied get rid of Pruitt at AMC. In addition to Argus noting that she spoke with Watkins or emailed with

43

him, he was copied on Downs' email to Argus.

Ms. Pruitt acknowledges that in the meeting with Argus on April 26, 2019, she said that no one told her to record the interview; however, Pruitt was on prescription pain medication following her surgery and does not even remember recording the meeting. This discrepancy calls for a credibility determination that only a jury can decide, not the court. *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (stating "[w]e may not weigh conflicting evidence or make credibility determinations of [our] own").

The R&R recommended granting summary judgment on this claim stating that Pruitt cannot meet the causation element because she engaged in misconduct that caused her removal, stating: "although the misconduct itself occurred in February of 2019 (before Plaintiff filed her EEOC charge) Downs only became aware of it after she filed the charge." Doc. 139 at 44-45. The R&R did not examine Pruitt's pretext argument. In her Objections, Pruitt argued that the R&R's analysis disrupts the *McDonnell Douglas* paradigm, injecting the pretextual excuse into the *prima facie* case. Doc. 142 at 19, citing *Wexler v. White's Fine Furniture*, 317 F.3d 564, 574-75 (6th Cir. 2003) ("a court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case"). The District Court adopted the R&R's analysis, stating that Downs finding out about the recording is an "intervening act" that breaks the causal

link. Doc. 144 at 11.

But the intervening act to negate causation would have to be something that Pruitt did *after* she filed her Charge. Recording the patient was not an intervening act, it was a *preceding* act. A defendant cannot dig into a plaintiff's employment history and claim that it "just found" out about an alleged rule violation by her and break the causal link to negate the *prima facie* case. At that point, it is simply the defendant's excuse for the adverse act—the second step of the 3-step *McDonnell Douglas* paradigm. And, after the employer provides its alleged legitimate non-discriminatory reason, the plaintiff gets to make her case as to why the excuse is a pretext for retaliation. That is what Pruitt did here.

On the other hand, a truly intervening act would be some conduct by the charging party after they file their charge which results in an adverse action. For example, in *Hankins*, the plaintiff admitted to yelling at a co-worker in violation of work rules *after* complaining about discrimination. *Hankins v. AirTran Airways, Inc.*, 237 F. App'x 513, 520-21 (11th Cir. 2007). This Court agreed with the trial court that this misconduct—occurring after her protected speech—"broke the causal connection." *Id*. at 521. But that is not the case here—Pruitt did not engage in any misconduct after filing her Charge, or at all. She voice-recorded the patient 2 months before filing her Charge, at the direction of AMC employee Watkins. This act was not the subject of any discipline at the time. But 5 days after she filed her Charge, it

45

suddenly became an issue.

As for Pruitt's lack of advancement under Argus, Allied has no excuse. But within a month of her reporting to Flowers' chain of command, outside of Argus' supervision, Pruitt was solicited to interview for, and received a higher paying assignment. The timing is uncanny and a jury could agree. The R&R stated that Pruitt could not complain about these acts because it was the result of her prior misconduct. Doc. 139 at 45-46. The District Court adopted this finding. Doc. 144 at 12, n.3. This assumes that Pruitt actually engaged in misconduct, which she disputes.

Pruitt produced "sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable." *Howard v. BP Oil Co.*, 32 F.3d 520, 526 (11th Cir.1994). The District Court's Order as to Pruitt's Title VII retaliation claim should be reversed and remanded for resolution by a jury.

## <u>CONCLUSION</u>

For the reasons herein, the District Court's Order should be reversed and this matter remanded for a jury trial on the merits.

Respectfully submitted,

　 /s/ Lisa C. Lambert　　　
Lisa C. Lambert
Georgia Bar No. 142135
Law Office of Lisa C. Lambert
245 N. Highland Avenue

Suite 230-139
Atlanta, Georgia 30307
404.556.8759
lisa@civil-rights.attorney

Attorney for Plaintiff/Appellant

## CERTIFICATE OF COMPLIANCE

I hereby certify in accordance with FRAP 32(a)(7)(c) that this brief complies with the type-volume limitation specified in Rule 32(a)(7)(B). Specifically, it contains 10,407 words in the Brief.

 /s/ Lisa C. Lambert
Lisa C. Lambert

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been sent via CMF to the attorneys identified below this 12th day of January 2024:

David C. Hamilton
Bianca A. Svensson
Martenson, Hasbrouck & Simon LLP
2573 Apple Valley Road
Atlanta, Ga 30319

 /s/ Lisa C. Lambert
Lisa C. Lambert